196                                421 Mass. 196

Nuclear Metals, Inc. *v.* Low-Level Radioactive Waste Management Board.

NUCLEAR METALS, INC. *vs.* LOW-LEVEL RADIOACTIVE
WASTE MANAGEMENT BOARD.

Suffolk. January 9, 1995. - October 17, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Hazardous Waste. Low-Level Radioactive Waste Management Board. Radioactive Waste. Administrative Law,* Agency's interpretation of regulation, Regulations.

An assessment imposed pursuant to G. L. c. 111H, §§ 4A and 4B, by the Low-Level Radioactive Waste Management Board on a manufacturer licensed by the United States Nuclear Regulatory Commission to receive, possess, use, transfer, or acquire radioactive materials was a lawful fee and not a tax, under the test set forth in *Emerson College* v. *Boston,* 391 Mass. 415 (1984). [201-207] LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

A Superior Court judge incorrectly dismissed a challenge to a decision of the Low-Level Radioactive Waste Management Board on the ground that the board lacked jurisdiction, where the board's interpretation of its governing statute and regulations promulgated thereunder to the effect that it did have jurisdiction was entitled to "considerable deference" by the court. [207-209]

A challenge to an assessment by the Low-Level Radioactive Waste Management Board was remanded to the Superior Court for return to the board for recomputation of the assessment in accordance with the unambiguous language of G. L. c. 111H, § 4 (*a*), where the board had made its computation regarding categories of waste not in accordance with the legislative directive. [210-212]

CIVIL ACTION commenced in the Superior Court Department on June 16, 1992.

The case was heard by *J. Harold Flannery,* J., on a statement of agreed facts.

The Supreme Judicial Court granted an application for direct appellate review.

*Philip M. Cronin* (*Robert A. McCall* with him) for the plaintiff.

*Peter Sacks*, Assistant Attorney General (*J. Raymond Miyares* with him) for the defendant.

GREANEY, J. Nuclear Metals, Inc. (plaintiff), filed a complaint in the Superior Court seeking, in count I, a determination that an assessment imposed on it by the Low-Level Radioactive Waste Management Board (board), acting pursuant to G. L. c. 111H, §§ 4A and 4B (1994 ed.), and corresponding regulations, 845 Code Mass. Regs. § 4.00 (1992),[1] was unlawful. Count II of the complaint presented an appeal from a decision of an administrative magistrate, adopted with minor revisions by the board, concluding that the amount of the assessment charged to the plaintiff was proper.

The parties submitted the case on a statement of agreed facts and the record of the administrative proceedings. A judge in the Superior Court ordered entry of judgment for the board on the claim contesting the validity of the assessment. He vacated the decision of the board on the plaintiff's administrative challenge to the computation of the assessment on the ground that the board lacked jurisdiction to hear the appeal, and he ordered that the claim in count II of the complaint be dismissed. Both parties appealed from the judgment, and we granted the board's application for direct appellate review. We affirm that part of the judgment which declares the assessment to be a valid fee rather than an unconstitutional charge. We vacate that part of the judgment dismissing the plaintiff's appeal from the administrative decision of the board, and remand the case to the Superior Court so that it may be returned to the board for administrative consideration of the plaintiff's claim respecting the amount of the assessment charged.

1. *Facts*. The material facts are straightforward and undisputed. The plaintiff is a manufacturer licensed by the United

---

[1]The board has since amended its regulations, and the relevant regulations are now codified at 345 Code Mass. Regs. § 4.00 (1994).

States Nuclear Regulatory Commission to receive, possess, use, transfer, or acquire radioactive materials. The plaintiff, which employs approximately 200 persons in the Commonwealth, uses depleted uranium in the manufacture of metal products for a range of applications, including kinetic penetrators used for armor piercing ammunition by the United States armed forces, and radiation-shielding components for medical, pharmaceutical, and industrial uses. As a byproduct of its manufacturing processes, the plaintiff produces low-level radioactive waste.[2] Based on data collected by the board, the plaintiff was among the top four generators of low-level radioactive waste in the Commonwealth during the years of 1990 and 1991. The assessment at issue totals $102,103.76.

2. *Statutory basis for the assessment.* The Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. §§ 2021a et seq. (1988) (Federal act), states as Federal policy that "[e]ach State shall be responsible for providing, either by itself or in cooperation with other States, for the disposal of . . . low-level radioactive waste generated within the State . . . ." 42 U.S.C. § 2021c (a) (1) (A). The goal of the Federal act is to decrease reliance on the few existing disposal sites, located in the States of Washington, South Carolina, and Nevada,[3] by encouraging States to enter into cooperative regional compacts and develop disposal sites for

---

[2]General Laws c. 111H, § 1 (1994 ed.), defines low-level radioactive waste as "radioactive material that (1) is neither high-level waste, nor spent nuclear fuel, [nor] by-product material as defined in section 11(e)(2) of the Atomic Energy Act of 1954, as amended, 42 USC Section 2014(e); and (2) is classified by the Federal Government as low-level radioactive waste, but not including waste which remains a federal responsibility, as designated in section 3(b) of the Low-Level Radioactive Waste Policy Act, as in effect as of the effective date of this chapter, as amended, 42 USC Section 2021c(b)."

[3]There is also a private commercial facility in Utah, not mentioned in the Federal act, that is authorized to accept for disposal waste which has very limited concentrations of radionuclides. The plaintiff has been able to send the limited amount of its waste which has appropriate characteristics to the Utah facility for disposal.

the low-level radioactive waste generated within each region. See 42 U.S.C. §§ 2021c, 2021e.

In *New York* v. *United States*, 505 U.S. 144 (1992), the United States Supreme Court interpreted the Federal act as providing to the States lacking in-State or regional disposal sites a series of strong incentives to comply with Federal policy concerning the disposal of low-level radioactive waste generated within their borders. *Id.* at 170. The Court explained that, in form, the Federal act is an "intricate" compromise between the States with, and the States without, disposal sites. *Id.* at 151. In effect, the Federal act authorizes burdens on interstate commerce that most likely would be unconstitutional absent express congressional authorization. See *Philadelphia* v. *New Jersey*, 437 U.S. 617 (1978) (law closing New Jersey's borders to waste generated outside territorial limits unconstitutional burden on interstate commerce). States with disposal sites are granted the right to place escalating surcharges, beginning in 1986-1987, on disposal in their existing facilities, and, as of 1996, to deny access to the existing disposal sites to waste generators located in any State that has not met specific "milestones" set out in the Federal act. Those milestones mark progress toward the siting and licensing of an in-State or a regional facility for the disposal of a State's low-level radioactive waste. *Id.* at 151-153. In the Court's words, "any burden caused by a State's refusal to regulate [in compliance with the Federal act] will fall on those [within the State's borders] who generate waste and find no outlet for its disposal." *Id.* at 174.

General Laws c. 111H (State act), inserted by St. 1987, c. 549, establishing the board and delineating its responsibilities, is the Commonwealth's response to the Federal act. See *Opinion of the Justices*, 397 Mass. 1201 (1986). Under the State act, the board is charged with preparing and implementing a management plan to provide for the safe and efficient management of low-level radioactive waste produced in

the Commonwealth. G. L. c. 111H, §§ 11, 12.[4] In conjunction with the Departments of Environmental Protection and Public Health, the State act charges the board with the selection of a site for the disposal of low-level radioactive waste generated in the Commonwealth. See G. L. c. 111H, §§ 17, 33. The board has the responsibility for choosing among an in-State facility open only to generators of waste in the Commonwealth, a small regional disposal facility, or a large regional disposal facility serving waste generators in New England and offering disposal services to generators outside the region. See 345 Code Mass. Regs. § 1.74 (1994). See also St. 1987, c. 549, § 6. In the event that the milestones in the Federal act are not met and access to existing disposal sites in other States is denied to waste generators in the Commonwealth, the board is required by statute to develop interim or emergency plans for the temporary storage of low-level radioactive waste. See G. L. c. 111H, § 12 (b) (10).

3. *The assessment.* Pursuant to G. L. c. 111H, § 4A, the board must "annually assess each person licensed or registered to receive, possess, use, transfer or acquire radioactive materials in the Commonwealth, amounts sufficient to defray the costs annually incurred by the board" to implement its plan for managing the disposal of low-level radioactive waste generated in the Commonwealth. The total assessment is capped by statute at $500,000. That amount is to be reduced by any funds appropriated or obtained from other sources for implementing the management plan. See G. L. c. 111H, § 4A.[5] The board is directed to apportion the total assessment among licensees and registrants,[6] "based on the volume and classification of radioactivity of waste produced by each

[4]The management plan is codified at 345 Code Mass. Regs. § 1.00 (1994).

[5]As an incentive, among others in the Federal act, States meeting the planning milestones are entitled to a share of the surcharges which the existing disposal sites are authorized to levy from waste generators in States that lack disposal sites. See 42 U.S.C. § 2021e (d).

[6]Users of radioactive material either hold a license from the United States Nuclear Regulatory Commission to possess federally regulated radioactive material, or hold a license from the Commonwealth's Depart-

421 Mass. 196                                      201

Nuclear Metals, Inc. *v.* Low-Level Radioactive Waste Management Board.

licensee and registrant which is shipped for disposal off site or stored for later disposal; provided, however, that the board shall make a minimum assessment on all licensees and registrants." *Id.* For purposes of apportioning the fiscal year 1992 assessment, the board first assessed a "minimum" flat fee of $75 to all licensees and registrants. The remainder of the total assessment was charged proportionally to licensees and registrants based on waste produced and shipped during 1990 and 1991. Excluded from the assessment calculation was data on waste produced during 1990 and 1991 and stored on-site for later disposal.

4. *Validity of the assessment.* The plaintiff challenges the validity of the assessment as a lawful fee. The plaintiff further argues that, if the assessment is viewed as a tax, it fails to pass constitutional muster. We agree with the judge, however, that the plaintiff has failed to satisfy its burden of proving that the assessment is not a lawful fee. See *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395, 403 (1985). See also *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536, 549 n.12 (1992).

"[T]he nature of a monetary exaction 'must be determined by its operation rather than its specially descriptive phrase.' " *Emerson College* v. *Boston*, 391 Mass. 415, 424 (1984), quoting *Thomson Elec. Welding Co.* v. *Commonwealth*, 275 Mass. 426, 429 (1931).[7] Fees generally fall into one of two categories. A fee may be categorized either as a user fee, charged by the proprietor of a particular instrumentality for its use, or as a regulatory fee, founded on the State's police power to regulate a particular activity or business. *Emerson College*, *supra* at 424. As Justice Breyer (then Judge Breyer) recently noted, "The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation. . . .

---

ment of Labor and Industries to possess radioactive materials that are not federally regulated. 345 Code Mass. Regs. § 1.02 (1994).

[7] We reject the plaintiff's argument that the term "assessment" necessarily means that a "tax" rather than a "fee," has been imposed. See *Union Pac. R.R.* v. *Public Util. Comm'n of Or.*, 899 F.2d 854 (9th Cir. 1990) (considering whether "assessment" was "fee" or "tax").

It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. . . . Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses." (Citations omitted.) *San Juan Cellular Tel. Co. v. Public Serv. Comm'n of P.R.*, 967 F.2d 683, 685 (1st Cir. 1992).

In the *Emerson College* case, this court observed that "fees share common traits that distinguish them from taxes: they are charged in exchange for a particular governmental service which benefits the party paying the fee in a manner 'not shared by other members of society,' . . . they are paid by choice, in that the party paying the fee has the option of not utilizing the governmental service and thereby avoiding the charge . . . and the charges are collected not to raise revenues but to compensate the governmental entity providing the services for its expenses" (citation omitted). *Id.* at 424-425, quoting *National Cable Television Ass'n v. United States*, 415 U.S. 336, 341 (1974). See *Southview Coop. Hous. Corp. v. Rent Control Bd. of Cambridge*, *supra* at 402; *Berry v. Danvers*, 34 Mass. App. Ct. 507, 510 (1993). A consideration of these factors, and the nature of the board's regulatory responsibility, compels the conclusion that the assessment authorized by the act is a valid fee.

The plaintiff's primary contention is that the board functions as a planning agency and provides no service for which it may legitimately exact a fee. We disagree. Because of the risk posed by low-level radioactive waste, see *New York v. United States*, *supra* at 149-150, its disposal is a highly regulated activity. There may be means to reduce the amount of waste produced by the plaintiff, and alternative disposal technology may be, or may become, available for small amounts of waste having particular characteristics. Nothing in the record suggests, however (and the burden is on the plaintiff), that the plaintiff will be able to avoid reliance on disposal facilities like those in Washington, Nevada, and

421 Mass. 196 203

Nuclear Metals, Inc. *v*. Low-Level Radioactive Waste Management Board.

South Carolina in the foreseeable future.[8] The terms of the Federal act have the effect of conditioning the plaintiff's access (and the cost of that access) to existing disposal sites (and to interim storage if the disposal sites are closed to Massachusetts generators) on the board's performance of its functions. Only the board can meet the progress milestones in the Federal act, negotiate for continued access to existing facilities on behalf of waste generators in the Commonwealth, enter into a regional compact, or set in motion the siting process for a disposal facility in, or near, the Commonwealth. Thus, if it is to continue to engage in its current manufacturing activities, the plaintiff must rely on a service presently provided by the board, in the form of planning for disposal of low-level radioactive waste generated in the Commonwealth in compliance with Federal law and standards. See *Mississippi Power & Light Co.* v. *United States Nuclear Regulatory Comm'n*, 601 F.2d 223, 229 (5th Cir. 1979), cert. denied, 444 U.S. 1102 (1980).[9] The assertion that the board has failed timely to meet certain of the Federal milestones is a complaint about the quality of the board's services that does not affect their basic character as regulatory services essential to the plaintiff.

---

[8]We note, in connection with this point, that the board has made a formal determination that additional disposal capacity for low-level radioactive waste generated in the Commonwealth is required to meet the present and projected needs of waste generators in the Commonwealth. 345 Code Mass. Regs. § 1.74 (1994).

[9]Contrary to the contention in the dissent, see *post* at 214 n.1, the record confirms that because of the terms of the Federal act, the plaintiff cannot manage the disposal of its waste without reliance on the regulatory services performed by the board. The Federal act authorizes the disposal facilities on which the plaintiff has relied in the past (as well as any new sites that are now opened), to refuse waste from generators in States which have not met the milestones in the Federal act. See *New York* v. *United States*, 505 U.S. 144, 174 (1992) ("States may either regulate the disposal of radioactive waste according to federal standards by attaining local or regional self-sufficiency, or their residents who produce radioactive waste will be subject to federal regulation authorizing sited States and regions to deny access to their disposal sites"). Nothing in the record supports the assertion that the plaintiff will not continue to need access to facilities comparable to those located in Washington, Nevada, and South Carolina.

The service provided by the board may, we think, reasonably be analogized, in some respects, to the service performed by the rent control board of Cambridge in the case of *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge, supra.* By statute, the city of Cambridge was entitled to regulate residential rental rates. A landlord dissatisfied with the maximum rent established for a particular unit could file a petition with the rent control board for an upward adjustment of the rent. As of 1981, the rent control board charged a fee in connection with the filing of such a petition, designed to compensate the board for the cost of processing a petition. *Id.* at 397, 402-404. The filing fees under consideration in the *Southview* case, which this court upheld as valid, obtained for the landlord a regulatory service that would have been unnecessary in the absence of legislation authorizing the city to control rental rates.[10] Similarly, in this case, the regulatory and planning services of the board are made essential to the plaintiff by the policies and incentives of the Federal act.

As to the remaining aspect of the first factor, the board's services provide a "sufficiently particularized" benefit to the plaintiff to qualify as a valid fee. While the safe disposal of low-level radioactive waste is a public benefit, see *New York* v. *United States, supra,* it is the plaintiff (and not the general public) which requires access to disposal facilities for low-level radioactive waste meeting Federal and State stan-

---

[10]We are unable to discern the "tangible benefit" to landlords of the service provided by the rent control board under discussion in the case of *Southview Coop Hous. Corp.* v. *Rent Control Bd. of Cambridge,* 396 Mass. 395, 403 (1985), which the dissent asserts was conferred. See *post* at 217. For this reason, we have suggested that the services provided by the rent control board and the board in this case are in some measure analogous. Certainly, the landlords seeking rental adjustments received nothing analogous to access to electrical services, use of a sewage system, or the right to moor a boat.

We do not think that a clear line necessarily can be drawn between planning activities and the provision of tangible benefits. Even if such a line could be drawn, in this case, the board's planning activities obtain for the plaintiff a present tangible benefit: continued access to facilities for the disposal of its radioactive waste.

421 Mass. 196                                    205

Nuclear Metals, Inc. *v.* Low-Level Radioactive Waste Management Board.

dards. See *Maine* v. *Department of Navy*, 973 F.2d 1007, 1013 (1st Cir. 1992). The services of the board will be required in any event. It is appropriate that the entities which generate low-level radioactive waste (and not the taxpayers of the Commonwealth) should shoulder costs associated with protecting the general public from the hazards posed by the waste. Other States have taken an approach similar to the Commonwealth's, passing on the cost of planning for its disposal to the generators of low-level radioactive waste. See, e.g., Conn. Gen. Stat. § 22a-164 (1993); N.Y. Pub. Auth. Law § 1854-d (2) (Consol. 1994).

The second and third factors of the *Emerson College* test are also satisfied. The plaintiff is not "compelled" to pay the fee, even though it must pay the fee so long as it engages in manufacturing activities in the Commonwealth that produce as a byproduct low-level radioactive waste. The plaintiff has a Federal license, and therefore a right, to possess and use low-level radioactive materials, but "[f]ees are not taxes 'even though they must be paid in order that a right may be enjoyed.'" *Bertone* v. *Department of Pub. Utils.*, *supra* at 549, quoting *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, *supra* at 402. The plaintiff has a "choice," in the sense that this term has been used in our cases, as to whether to engage in manufacturing activities resulting in the production of low-level radioactive waste. Cf. *Emerson College* v. *Boston*, *supra* at 426 (because of danger to public, plaintiff could not forgo firefighting services for which fee was charged). Just as the plaintiffs in the *Bertone* and *Southview* cases could have avoided the charges under consideration in those cases by forgoing the rights for which the charges were assessed, the plaintiff in this case could have avoided the assessment imposed by the board, which was imposed only on current licensees and registrants.

We recognize that the "choice" presented in these cases cannot realistically be considered a free choice. In the *Bertone* case, the "choice" presented to the plaintiffs was to forgo the development of their property. In the *Southview* case, the "choice" presented to landlords in Cambridge was

to forgo obtaining what they considered a reasonable economic return on their investment in residential real estate. Here, the "choice" presented to the plaintiff is to cease engaging in activities that produce low-level radioactive waste. Several recent Federal cases we have examined do not mention the "voluntary" factor of the *Emerson College* test, but focus instead on whether the service in connection with which the charge is levied benefits the regulated entities in a way distinguishable from any benefit provided to the public at large. For example, in *Maine* v. *Department of Navy*, *supra*, the United States Court of Appeals for the First Circuit considered licensing and per-pound generation charges levied on the Navy by environmental authorities in Maine to provide for the safe disposition of hazardous waste produced at the Navy's shipyard at Kittery. There was no way to avoid payment of the charges. The court found the charges to constitute a classic regulatory fee which raised funds to defray an agency's regulation-related expenses and which benefited the Navy (and other regulated entities) by ensuring compliance with State environmental goals. *Id.* at 1012-1013. See *Union Pac. R.R.* v. *Public Util. Comm'n of Or.*, 899 F.2d 854, 859-861 & n.11 (9th Cir. 1990). Here, the assessment made by the board is designed to raise funds to satisfy directives given the State by Federal law as a result of manufacturers within the State producing dangerous radioactive waste which must rely on the State to arrange for its proper disposal. The assessment is a classic regulatory fee, and the element of choice is not a compelling consideration which can be used to invalidate an otherwise legitimate charge.[11]

---

[11]The dissent distinguishes this Federal authority by noting that in most cases (but not all) where the service provided was not voluntarily requested, the regulatory agency in question issued licenses or permits to the fee-paying entities, and suggests that the voluntary application for a license or permit supplies the otherwise absent element of voluntariness. *post* at 216 & n.4. The decisions themselves make no such point. If a regulated entity must obtain a license to engage in a particular activity or business, the application for a license is not a free or unconstrained act.

The dissent, *post* at 218, also relies on a recent decision by the Appeals Court, *Berry* v. *Danvers*, 34 Mass. App. Ct. 507 (1993), in which that

Finally, the revenue derived from the assessment obviously is used to fund the particularized services provided by the board. The statutory authorization for the assessment requires the board to "annually assess . . . amounts sufficient to defray the costs annually incurred by the board for such purposes." G. L. c. 111H, § 4A (*a*). The amount the board is permitted to raise is capped at $500,000; that amount is to be reduced by, among other funding sources, any part of a prior assessment that has not been expended to defray costs incurred by the board. No part of the monies raised by the assessment is treated as general revenue of the Commonwealth. *Id.* ("There is hereby established on the books of the commonwealth a separate fund, to be known as the Low Level Radioactive Waste Management Fund.") See *Union Pac. R.R.* v. *Public Util. Comm'n of Or.*, *supra* at 857.

We reject the plaintiff's argument that the board's activities, all of which are funded by means of the assessments charged to waste generators, include services that are not of particular benefit to it. In connection with this point, the plaintiff singles out public information programs and the employment of a public participation coordinator. See G. L. c. 111H, § 4 (*a*) (6). As the board points out, an obvious purpose of such programs is to increase public acceptance of the need for a disposal facility for low-level radioactive waste, including the possibility that such a facility might be constructed in the Commonwealth. This service is essential to the board's ability to meet its statutory obligations and directly benefits a generator of low-level radioactive waste. Because we conclude that the assessment is a valid fee, we need not consider the plaintiff's arguments that the assessment is improper when considered as a tax.

5. *The computation of the assessment.* On his own motion, the judge dismissed the plaintiff's appeal from the adminis-

court concluded that a sewer system connection charge did not meet the voluntariness requirement of the *Emerson College* case. The *Berry* case is difficult to distinguish from the case of *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536 (1992). The *Bertone* case is the controlling authority.

trative decision of the board on the ground that the board's regulations did not permit administrative consideration of "the substantive validity of an assessment made pursuant to the Low-Level Radioactive Waste Board's authority."

The regulations at issue provided (they have since been amended), in pertinent part, as follows. A licensee or registrant in receipt of a written notice of an assessment due and payable was required to "make payment in full on or before the due date . . . specified in the statement of assessment amount." 845 Code Mass. Regs. § 4.03 (5). "Failure *without just cause* to pay any assessment when due" constituted a violation of 845 Code Mass. Regs. § 4.00 (emphasis added). 845 Code Mass. Regs. § 4.04 (1). Any licensee notified by the board of a violation of § 4.00 was entitled to request a hearing before being assessed civil penalties. 845 Code Mass. Regs. § 4.04 (4). The amount of the penalty was to be determined by the board based on consideration of a list of six factors. *Id.*[12]

The board interpreted its governing statute, and the regulations promulgated thereunder, as permitting it to consider, in an administrative proceeding, whether a licensee or registrant had "just cause" to decline payment of an assessment because the assessment had been computed in a manner inconsistent with the statute and regulations. "An agency's construction of its own rules and regulations 'is one to which considerable deference is due.' " *Boston Police Superior Officers Fed'n* v. *Boston*, 414 Mass. 458, 462 (1993), quoting *Northbridge* v. *Natick*, 394 Mass. 70, 74 (1985). We accept the board's position on this point.[13] A waste generator might

---

[12]General Laws c. 111H, § 4A (*a*), the statutory authority for the regulations provides, in pertinent part: "Failure without just cause to pay any lawful assessment pursuant to this section shall constitute a violation of this section."

[13]The judge concluded that the board's regulations limited administrative proceedings to a consideration of the size of the penalty that should be imposed for a licensee's failure to remit its assessment to the board within the ninety days specified by regulation. See 845 Code Mass. Regs. §§ 4.03 (3), 4.04 (4) (1992). The judge neither ruled nor implied that the board could not adopt regulations permitting administrative consideration of sub-

reasonably be viewed as justified in declining to pay a wrongly computed assessment. We agree that it makes little sense to view the regulations as limiting administrative consideration to determining the amount of a penalty before it has been determined whether the assessment was legal and proper. The judge should have considered the substance of the plaintiff's challenges to the computation of the assessment.

Before the board and the judge, the plaintiff raised numerous challenges to the board's method of computing its assessment. Before this court, the plaintiff presses, as its single contention, the board's exclusion from the assessment computation data on low-level radioactive waste produced during the relevant period and stored on-site for future disposal. The parties join in requesting that we resolve this issue.

As a general rule, this court does not consider claims which were not addressed by the court below. "However, '[t]here may always be . . . particular circumstances which will prompt a reviewing or appellate court . . . to consider questions of law which were . . . [not] passed upon by the court . . . below . . .' " (footnote omitted). *Cruz* v. *Commissioner of Pub. Welfare*, 395 Mass. 107, 111 (1985), quoting *Hormel* v. *Helvering*, 312 U.S. 552, 557 (1941). The plaintiff's claim concerns the interpretation of statutory and regulatory language and the validity of the agency's interpretation of its regulation. These are questions of law, appropriate for our resolution. The issue properly was raised in administrative proceedings. The agency has considered and passed on the point and an adequate record exists for its review. In these circumstances, as a matter of judicial economy, we shall address the merits of the plaintiff's challenge to the validity of the assessment.

stantive challenges to the validity of an assessment. The board has amended its regulations to provide explicitly the right to a hearing for "[a]ny licensee or registrant who receives a statement of assessment amount . . . and who wishes to contest the validity, method of computation or amount of such assessment." 345 Code Mass. Regs. § 4.03 (6) (a) (1994).

As was previously noted, the relevant legislation directs the board to apportion the total assessment "based on the volume and classification of radioactivity of waste produced by each licensee and registrant which is shipped for disposal off site or stored for later disposal." G. L. c. 111H, § 4A (a). The applicable regulation provides that "[f]or each licensee and registrant, the volume of Class A, B and C waste shall be measured by the average annual amount of waste produced and shipped for disposal off site or stored for later disposal by such licensee or registrant. To establish this average, the Board shall utilize the yearly production figures given in the Board's annual surveys for the two most recent calendar years for which, in the judgment of the Board, data sufficient for these purposes have been produced, except that, if the Board determines that such surveys·have not produced two years' data sufficient for these purposes, it shall substitute whatever data, in its judgment, best approximates the data required." 845 Code Mass. Regs. § 4.03 ·(2) (c) (1).[14]

The board based the fiscal year 1992 assessment on data it collected pertaining to waste produced by registrants and licensees during 1990 and 1991. Although its survey requested data on waste produced during 1990 and 1991 and stored for later disposal, the board computed the individual assessment of each licensee and registrant based solely on waste shipped for disposal off-site during 1990 and 1991. According to the deputy director of the board, data on waste stored for future disposal were excluded because the data available on waste produced and stored for later disposal were less reliable than the data on waste shipped off-site for disposal. In the board's view, the "substitution provision" of 845 Code Mass. Regs. § 4.03 (2) (c) (1), permitted it to rely solely on data as to waste shipped off-site for disposal in ap-

---

[14]The board's regulations define "Waste Produced and Shipped for Disposal Off Site or Stored for Later Disposal," as low-level radioactive material in a licensee's or registrant's possession that will not be put to productive use by any person, will not be discharged as air or water effluent, and is not being stored for decay within the storage period authorized by a current license or registration. 845 Code Mass. Regs. § 4.02.

portioning the assessment among licensees and registrants. Nonetheless, according to the deputy director, the board anticipated relying on data as to waste produced and stored for later disposal in apportioning the annual assessment if and when licensees and registrants in the Commonwealth could no longer ship low-level radioactive waste out of State for disposal.

The plaintiff contends that the board was required to apportion the assessment based on waste produced in the calendar period and either shipped off-site for disposal *or* stored for later disposal and that the board's interpretation of its regulation fails to comport with the governing legislation. We agree.

" 'A state administrative agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing.' A. Cella, Administrative Law and Practice § 747 (1986). See *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 850 (1977); *Cleary* v. *Cardullo's, Inc.,* 347 Mass. 337, [344] (1964); *Massachusetts Nurses Ass'n* v. *Board of Registration in Nursing,* 18 Mass. App. Ct. 380, 389 (1984). Regulations properly adopted by an administrative agency stand on the same footing as statutes and all rational presumptions are to be made in favor of their validity. *Greenleaf Fin. Co.* v. *Small Loans Regulatory Bd.,* 377 Mass. 282, 293 (1979). *Massachusetts Nurses Ass'n, supra.* Such regulations are not to be declared void unless their provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate, *Massachusetts Nurses Ass'n, supra* at 389 n.19 . . . ." *Berrios* v. *Department of Pub. Welfare,* 411 Mass. 587, 595-596 (1992). These principles of deference, however, are not principles of abdication. See *Warcewicz* v. *Department of Envtl. Protection,* 410 Mass. 548, 550 (1991). When an agency's interpretation of its regulation cannot be reconciled with the governing legislation, that interpretation must be rejected. See *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977).

General Laws c. 111H, § 4A (*a*), requires the board to apportion the assessment among waste generators "based on the volume and classification of radioactivity of waste produced by each licensee or registrant which is shipped for disposal off site or stored for later disposal." "The word 'or' is given a disjunctive meaning unless the context and the main purpose of all the words demand otherwise." *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Auth.*, 350 Mass. 340, 343 (1966), and cases cited. See *Bello* v. *South Shore Hosp.*, 384 Mass. 770, 782 (1981). The language of § 4A is unambiguous and includes both waste produced within the given calendar period that is shipped for disposal off-site *or* stored on-site for later disposal. Both categories of waste are subject to the assessment required to be apportioned among generators of low-level radioactive waste in the Commonwealth. There is nothing in the statute which suggests that the board has been granted discretion to eliminate from its computation of the assessment data concerning waste which is stored on-site for future disposal.

The testimony before the administrative magistrate was that the board considered the data on waste stored for future disposal to be somewhat less reliable for purposes of determining volume and activity of waste that should be subject to the assessment. The board admitted, nonetheless, that it would be relying on data concerning waste stored for later disposal in calculating its annual assessment once out-of-State disposal facilities closed their doors to waste generators in the Commonwealth. Thus, there was no contention that the board could not conform to the legislative directive. In these circumstances, we conclude that the board's interpretation of the "substitution provision" of its regulation cannot be reconciled with the language of G. L. c. 111H, § 4A. The board will have to recompute the plaintiff's fiscal year 1992 assessment. In so doing, the board may use actual 1992 data and any other information that has become relevant since this controversy began.

6. *Commerce clause violation.* The plaintiff also contends that the assessment is in violation of the commerce clause of

the United States Constitution. This contention is based on differing treatment accorded by the board, for purposes of calculating the assessment, to waste shipped for disposal off-site and waste stored on-site for future disposal. In the view we take of the case, which is that the Legislature has not authorized differing treatment for these two categories of waste, we need not consider the plaintiff's challenge to the assessment based on the commerce clause.

7. *Disposition.* We affirm the judgment as to count I of the plaintiff's complaint, declaring the assessment charged by the board a fee and not an unconstitutional tax. We vacate that part of the judgment which vacates the administrative decision of the board and dismisses the plaintiff's appeal from that decision. We remand the case to the Superior Court so that it may be returned to the board for recomputation of the plaintiff's fiscal year 1992 assessment in accord with the principles expressed in this opinion.

*So ordered.*

LYNCH, J. (dissenting, with whom O'Connor, J., joins). The assessment at issue cannot be justified as a fee for services; it is instead an unconstitutional tax. The assessment does not possess any of the common traits which distinguish a fee from a tax, as set out in *Emerson College* v. *Boston*, 391 Mass. 415, 424-425 (1984).

First, the party paying the fee must receive in exchange a particular government service which benefits that party in a manner not shared by the general public. *Id.* at 424. In this case, however, the activities of the Low-Level Radioactive Waste Management Board (board) are not services which provide a tangible present benefit to the plaintiff. The board's relevant statutory task is to produce a management plan for the purpose of protecting public health, safety, and the environment in the safe and efficient disposal of low-level radioactive waste. G. L. c. 111H, § 12 (1994 ed.). The board does not license or regulate the generation, processing, or treat-

ment of low-level radioactive waste. There is no evidence that the plaintiff has or will use any disposal facilities operated, planned, or licensed by the board, or even that any such disposal facilities do or will exist.[1]

While the plaintiff may benefit from the activities of the board in planning for and managing the disposal of low-level radioactive waste in the future, there is no evidence to suggest any present benefit to the plaintiff from these activities. Until such time as the board's plan for the disposal of waste is implemented, there are no beneficiaries of the board's "services." Without any present beneficiaries, it is impossible to determine whether the benefits of the services are sufficiently particularized to meet the first prong of the *Emerson College* test.[2]

Moreover, the board's planning activities do not provide the type of tangible benefit which existed where our courts

---

[1]The court relies on the board's contention that, if the plaintiff is to continue to engage in its current manufacturing activities, it must rely on a service provided by the board in the form of planning for disposal of low-level radioactive waste generated in the Commonwealth in compliance with Federal law and standards. *Ante* at 203. The plaintiff has managed its own low-level radioactive waste in the past by shipping it to sites in South Carolina, Nevada, Washington, and Utah. The court relies on the fact that this situation may change in the future and that, by 1996, States are *authorized* to refuse waste under certain conditions. *Ante* at 199. Such future contingencies do not justify the imposition of the current fee for services. Furthermore, there is no indication that the plaintiff will be unable to continue managing its own waste without the assistance of the board. Moreover, the plaintiff need not show that it will be able to avoid reliance on out-of-State disposal facilities in the future in order to meet its burden here.

[2]In characterizing the planning activities of the board as services which provide a benefit to the plaintiff, the court fails to distinguish between present and future potential services. *Ante* at 202-203. On the one hand, a fee may be charged for a service which is presently available, even if the service is not actually used. See *Maine* v. *Department of Navy*, 973 F.2d 1007, 1014 (1st Cir. 1992) (Navy benefits from availability of spill response team, even though team has never responded to spill at shipyard). On the other hand, no case has held that a fee may be charged for a service the benefit of which is presently unavailable. In spite of the court's assertion to the contrary, there is nothing in the record to support the contention that the board's activities provide the plaintiff with continued access to waste facilities.

have upheld the imposition of charges as valid fees. See *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536 (1992) (hook-up charge for electrical service); *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395 (1985) (charges assessed by rent control board for rent adjustment services). See also *Winthrop* v. *Winthrop Hous. Auth.*, 27 Mass. App. Ct. 645 (1989) (annual charge for connection to common sewer system); *Commonwealth* v. *Caldwell*, 25 Mass. App. Ct. 91 (1987) (mooring and slip fee for harbormaster services). I discern no compelling reason to expand the concept of particularized services to encompass the planning activities of the board. On the contrary, there is a sound policy reason to limit the type of service for which fees may be charged to those granting the user tangible present benefits such as existed in the cases cited above. If the board is permitted to charge a fee for its planning activities, then any agency of government with planning responsibilities could fund its operating expenses by charging fees to anyone who might in some way benefit in the future from that agency's plans.

There are services for which the plaintiff does receive a present benefit, but the board does not provide them. The plaintiff receives a license to receive, acquire, possess, and transfer low-level radioactive waste from the United States Nuclear Regulatory Commission (NRC) and is subject to regulation and inspection by that agency. See 42 U.S.C. §§ 2092, 2093, 2111, 2113, 2232, 2233, 2236 (1988); 10 C.F.R. §§ 40.1-40.4, 40.14, 40.20, 40.31, 40.32, 40.35, 40.41, 40.51 (1995); 10 C.F.R. §§ 40.34, 40.42, 40.43 (1992). The NRC charges the plaintiff a fee for the costs of processing the license application and regulating the licensee. 10 C.F.R. §§ 170.31, 171.16 (1992). The Federal act does give the States limited power to regulate the disposal of low-level radioactive waste. 42 U.S.C. § 2021c (a) (1) (1988). See *New York* v. *United States*, 505 U.S. 144, 174 (1992). At the same time, however, the Federal act explicitly reserves to the NRC the right to continue regulating its licensees in most, if

not all, other aspects of the plaintiff's operations. 42 U.S.C. § 2021d (b) (3) (1988).[3]

In addition, when and if the board provides the plaintiff with access to a low-level radioactive waste disposal facility, the statute requires that a surcharge be levied on anyone using the facility. G. L. c. 111H, § 33 (*a*) (6), § 38 (*c*), § 41, § 42 (1994 ed.). This surcharge, which would be imposed in exchange for the use of a disposal facility, a service which would plainly benefit the plaintiff, more closely resembles a fee than the charge before the court.

The second common characteristic of a fee is that it is paid by choice. *Emerson College, supra* at 424-425. Generally, fees are charged for services voluntarily requested. *Id.* at 426. See *National Cable Television Ass'n* v. *United States*, 415 U.S. 336, 340 (1974) ("A fee . . . is incident to a voluntary act, e.g., a request that a public agency permit an applicant to practice law or medicine or construct a house or run a broadcast station"); *New England Power Co.* v. *United States Nuclear Regulatory Comm'n*, 683 F.2d 12, 14 (1st Cir. 1982), quoting *National Cable Television Ass'n, supra*, with approval. Here, the plaintiff did not request the board to develop a plan for managing and effecting the safe disposal of low-level radioactive waste.[4]

---

[3]Title 42 U.S.C. § 2021d (b)(3) (1988), provides, in relevant part:

"Nothing contained in [this act] . . . may be construed to confer any new authority on any . . . State —

"(A) to regulate the packaging, generation, treatment, storage, disposal, or transportation of low-level radioactive waste in a manner incompatible with the regulations of the Nuclear Regulatory Commission or inconsistent with the regulations of the Department of Transportation;

"(B) to regulate health, safety, or environmental hazards from source material, byproduct material, or special nuclear material; [or]

"(C) to inspect the facilities of licensees of the Nuclear Regulatory Commission . . . ."

[4]As the court notes, some Federal courts have upheld fees where the services provided were not voluntarily requested. See *Maine* v. *Department of Navy*, 973 F.2d 1007, 1012-1014 (1st Cir. 1992), and cases cited. *Ante* at 206. In *Maine* and the cases it cites (with one exception), the fee-paying party also sought or received a license or permit from the regulatory agency to engage in certain activities. Thus the voluntary act of applying for a permit or license was a precursor to the regulatory activities for

421 Mass. 196                                       217

Nuclear Metals, Inc. *v.* Low-Level Radioactive Waste Management Board.

The element of voluntariness distinguishes this case from *Southview Coop. Hous. Corp.* v. *Rent Control Bd. of Cambridge*, 396 Mass. 395 (1985), and *Bertone* v. *Department of Pub. Utils.*, 411 Mass. 536 (1992). In *Southview*, landlords, dissatisfied with the maximum rent, chose to file petitions with the rent control board for rent adjustments. The rent control board imposed a charge in connection with the filing of a petition, designed to compensate the board for its services. In *Bertone*, the developers of a condominium project requested an electrical service hook-up from the local utility company. The utility charged a fee for the costs of providing electrical service. In both cases, then, the individuals protesting the fees voluntarily requested the services for which they were charged. In the present case, by contrast, the plaintiff did not request any services from the board. See *Berry* v. *Danvers*, 34 Mass. App. Ct. 507, 512-513 & n.6 (1993).

The court says the plaintiff can choose whether to engage in manufacturing activities resulting in the production of low-level radioactive waste. Although recognizing that this "choice" cannot realistically be considered voluntary, the court states that the element of choice is not a compelling consideration which can be used to invalidate an otherwise legitimate charge. *Ante* at 206. I cannot accept the court's cavalier dismissal of this crucial element.

The plaintiff does not have a choice in paying the fee; it is "compelled" to do so. The plaintiff is not able to avoid paying without forfeiting its Federal license and, thereby, forfeiting its right to use radioactive material. Avoidance of the fee by foregoing a privilege bestowed by a Federal license can hardly be described as a voluntary act. See *Emerson*

---

which the agency charged a fee. But see *South Carolina ex rel. Tindal* v. *Block*, 717 F.2d 874, 887 (4th Cir. 1983), cert. denied, 465 U.S. 1080 (1984). Here, the board neither issues nor regulates the plaintiff's license to possess low-level radioactive waste. It is important to note, which the court does not, the distinction between paying a fee to the agency which issues the license and paying a fee to another agency not responsible for the licensing or the regulating of the fee payor.

*College* v. *Boston, supra* at 428. See also *Berry* v. *Danvers, supra* (sewer system connection charge did not meet voluntariness test where regulation prohibited individual sewage disposal systems).

The third characteristic of a fee is that it is not collected for general revenue but to compensate the agency for its services. *Emerson College, supra* at 425. To require the plaintiff to subsidize the administrative costs of an agency simply because the agency makes plans that might affect the plaintiff in the future is compensating an agency for its expenses, but certainly not for its services. Such a scheme is a far cry from the payment of a fee for the use of State-owned property, facilities, or the issuance of licenses or permits. To permit the fee for services concept to be based on such a tenuous relationship would destroy a fundamental concept on which taxation is based.

Since the charge is not a valid fee, it can only be justified as a tax. The board contends that the assessment on the plaintiff should be upheld as a valid excise on the privilege of generating low-level radioactive waste requiring disposal. I disagree. For an excise on the enjoyment of the privilege to be valid, the exercise of the privilege must be a voluntary act. An excise may be imposed only where "the element of absolute and unavoidable demand is lacking." *Emerson College* v. *Boston, supra* at 428, quoting P. Nichols, Taxation in Massachusetts 16 (3d ed. 1938). What I said in discussing the charge as a fee applies here as well. The plaintiff would not be able to avoid paying the tax without forfeiting the privilege granted by its Federal license. Avoidance of the tax by forgoing a privilege bestowed by a Federal license can hardly be described as a voluntary act. See *Emerson College* v. *Boston, supra* at 426. Furthermore, to suggest that the plaintiff could cease doing business as an alternative to paying the tax is to frustrate the use which is authorized by its Federal license and calls into question the preemption doctrine.

Moreover, the taxing power under our Constitution comprehends only two general powers: to impose proportional

and reasonable taxes on property, and to impose duties and excises on commodities. *Opinion of the Justices*, 220 Mass. 613, 618 (1915). By mandating a minimum assessment of seventy-five dollars on all licensees, the statute mixes the two general powers and impermissibly imposes an excise tax on the right of a licensee to hold and to own property. *Emerson College, supra* at 428.

I conclude, in light of the foregoing analysis, that the assessment is an unconstitutional tax. I therefore respectfully dissent.