Neel, Stephen E., J.
Plaintiffs Massachusetts Association of Health Plans (MAHP) and associated individual health plans (Plans) seek an order enjoining defendant Joseph G. Murphy, Commissioner of Insurance (Commissioner), from prohibiting or preventing the Plans from charging and collecting increased rates from small group and individual subscribers effective April 1, 2010. On that date the Commissioner disapproved most of the Plans’ proposed new rates for those subscribers, calling the rate increases “unreasonable in relation to the benefits provided and excessive.” Plaintiffs allege that his disapproval was arbitrary, capricious, without authority, and unconstitutionally confiscatory. Their complaint claims that, absent immediate relief from the Court, the Plans will suffer substantial collective losses that will deplete their reserves, weaken their financial stability, and in some instances threaten their near-term solvency.
What the plaintiffs in effect request is that the Court, at this early stage, approve — through a preliminary injunction, pending a trial and final judgment— the rate increases which the Plans seek to charge small group and individual subscribers. After hearing, and review and consideration of the memoranda, affidavits, and other materials submitted, the Court declines to grant the plaintiffs’ request, and instead directs plaintiffs to exhaust their administrative remedies before seeking judicial relief. That course — required by Massachusetts law in all but rare circumstances, which as discussed below are not present here — will allow the Plans to develop an adequate factual record, and seek timely relief, through the administrative hearing process. If the Plans do not obtain from that process the relief they seek (and it is within their power to have that decision sixty days from today), they may appeal that final administrative decision to Superior Court under the state’s administrative procedure act, G.L.c. 30A.
Because plaintiffs have not exhausted their administrative remedies, and because they have not demonstrated that they are otherwise entitled to injunctive relief, their motion for preliminary injunction will be denied.
BACKGROUND
The Plans are health maintenance organizations or health care insurers (HMOs) that offer health insurance to small groups and individuals in the Commonwealth (sometimes referred to as the merged market) pursuant to G.L.c. 176G.[2] Together, the Plans provide coverage to about 93% of the merged market.[3]
The Legislature has created a comprehensive statutory structure to regulate the provision of health insurance. Premiums, or rates, to be charged by HMOs to consumers, including the merged market, are governed by G.L.c. 176G, §16, which reads, in pertinent part, as follows:
The subscriber contracts, rates and evidence of coverage shall be subject to the disapproval of the commissioner. No such contracts shall be approved if the benefits provided therein are unreasonable in relation to the rate charged, nor if the rates are excessive, inadequate or unfairly discriminatory.
Prior to February 10, 2010, 211 CMR 43.08, promulgated under the authority of G.L.c. 176G, §17, provided that “(e]ach HMO shall submit proposed rates and benefits, or changes thereof, on or before their effective dates and at least at the beginning of each calendar year. Submissions are subject to the Commissioner’s disapproval if the benefits and rates do not meet the requirements of M.G.L.c. 176G, §16.” On February 10, 2010, Governor Deval Patrick publicly announced that he was “directing the Commissioner of Insurance, on an emergency basis, to require health insurance companies to file any increases or changes to rates before they take effect and to disapprove the increases if they are unreasonable or excessive. Any increases significantly higher than the current level of medical cost inflation, which today is 3.2 percent, will be challenged.” Kluft Aff., Ex. A.
On that same day, the Commissioner promulgated, on an emergency basis, an amendment to 211 CMR 43.08 (the amended regulation). The amended regulation provides that “in the case of small group health coverage rate increases or changes to small group rating factors . . . with effective dates on or after April 1, 2010, [proposed rates] shall be filed at least 30 days before their effective dates. Filings are subject to the Commissioner’s disapproval if the benefits and rates do not meet the requirements of M.G.L.c. 176G, §16.” The amended regulation further provides that a submission does not constitute a complete filing unless it includes an actuarial memorandum and specified categories of additional documentation.[4] Of considerable importance to the motion before the Court, the amended regulation also contains the following provision:
If the Commissioner disapproves a filing, he shall notify the HMO in writing no later than the effective date of the rates or changes, and he shall state the reason(s) for the disapproval. The HMO may request a hearing on the disapproval to be held within 30 days of the notice by filing a written request with the Division of Insurance for a hearing within 15 days of its receipt of such notice. The Commissioner shall issue a written decision within 30 days after the conclusion of the hearing. The HMO may not implement the disapproved rates, or changes at any time unless the Commissioner reverses the disapproval after a hearing or unless a Court vacates the Commissioner’s decision.
*70 Also on February 10, 2010, the governor filed legislation proposing that “if a carrier files for an increase in a small group product’s base rate over the prior year’s base rate by an amount that is more than 150 percent of the prior calendar year’s percentage increase in the consumer price index for medical care services[5] . . . [the rate] shall be presumptively disapproved as excessive by the commissioner ...” Complaint, para. 35.
On February 24, 2010, the Deputy Commissioner issued Filing Guidance Notice 2010-A (Guidance) which provides, among other things, that “Health Plans may not increase a rate from the prior year if the filing is disapproved. For example, if a group policy is renewing on April 1st, and the March 1st filing for April rates is disapproved, the prior April’s rates must stay in effect until such time, if any, that the Health Plan’s filing is deemed not disapproved.” (Emphasis in original.)
On or about March 1, 2010, the Plans submitted to the Commissioner their respective small group and individual proposed rate increases, to be effective April 1, 2010 (the submitted rates), accompanied by actuarial memoranda certifying that the submitted rates were in compliance with the provisions of G.L.c. 176G, §16. See, e.g., Trocki Aff., para. 25. Nearly all of the submitted rates represent an increase over the Plans’ April 2009 rates in excess of 150% of the prior year’s Medical CPI.
On March 25, 2010, the Deputy Commissioner of Insurance orally communicated to each Plan that the Division of Insurance would recommend that the Commissioner disapprove the submitted rates as excessive and unreasonable. See, e.g., Trocki Aff., para. 28. Among the reasons stated for this recommendation was that the increases were above the 2009 Medical CPI increase for the New England region, which he stated to be 5.1%.[6] See, e.g., id. The Deputy Commissioner also informed the Plans that they could submit an amended rate filing by noon on March 30, 2010, to reflect an increase over the 2009 rates of no more than 7.7% (or 150% of the 2009 increase in Medical CPI for New England). According to the Plans, the Deputy Commissioner informed them that if they failed to comply, the Commissioner would disapprove the submitted rates and require the Plans to charge subscribers the rates charged in April 2009, and to refund or credit any amounts charged in excess of those rates. Id. None of the Plans elected to submit amended filings. Complaint, para. 46.
On or about April 1, 2009, by letter the Commissioner disapproved nearly all of the submitted rates filed by each of the Plans on several grounds reflecting those stated orally by the Deputy Commissioner. Each disapproval letter states that the Plan’s filing “contains rates that are unreasonable and excessive because [its] overall assumed trend, viewed as a combination of utilization and contracted rates of reimbursement to providers, has increased at a rate that is significantly higher than the rate of change in the 2009 Consumer Price Index for medical care services for the New England Region . . . Further, [the Plan’s] overall assumed trend is not within 100% to 150% of Medical Care Services CPI, which the Division finds to be a reasonable range for this trend.” See, e.g., Beagan Aff., Ex. 2. The letters state that, although each filing was disapproved for more than one reason, “the Division may have independently disapproved [the Plan’s] Filing for each reason listed.” The letters also notify the Plans that, pursuant to G.L.c. 30A, they have the right to request a hearing on the Division’s disapproval of the submitted rates “by submitting a written request to the Division within 15 days of receipt of this Notice of Disapproval.”
On April 5, 2010, the Plans filed their emergency motion for injunctive relief, requesting that the Court enter a preliminary injunction enjoining the Commissioner from prohibiting them, pending resolution of the case or further order of the Court, from charging and collecting the submitted rates from those subscribers whose contracts are effective on or after April 1, 2010 or, in the alternative, from collecting the submitted rates and holding in trust the difference between the submitted rates and each plan’s applicable 2009 rates increased by 7.7%.
DISCUSSION
Resolution of the plaintiffs’ motion for injunctive relief requires analysis of several interrelated issues.[7] The first is that of subject matter jurisdiction, Le.: whether, as the Commissioner argues, the Court is without power to act in any way on plaintiffs’ motion (or otherwise in this case) because plaintiffs are required to exhaust their administrative remedies before they may sue the Commissioner and seek relief from the Court. To make that determination, the Court must first answer two questions: (1) does the doctrine of exhaustion of administrative remedies apply in this case, and if so (2) in the circumstances of this case, should the plaintiffs be relieved from the exhaustion requirement because pursuit of further relief from the Commissioner would be futile.
If the answer to the first question is no, or to both questions yes, then the Court has jurisdiction. If, however, the Court determines that plaintiffs must exhaust their administrative remedies and that it would not be futile to do so, then the Court must determine whether it nevertheless has the power, on some other ground, to act on plaintiffs’ motion for injunctive relief.
Finally, if the Court determines that it has the power to act on plaintiffs’ motion, the Court must determine whether plaintiffs have established entitlement to the relief they seek.
*71 I. Subject Matter Jurisdiction
A.The Doctrine of Exhaustion of Administrative Remedies
Where a plaintiff challenges a decision of a state agency, “ordinarily exhaustion of administrative remedies is required before a party may have resort to the courts . . .” Ciszewski v. Industrial Accident Board, 367 Mass. 135, 140 (1975). The Supreme Judicial Court more recently stated, in Athol Memorial Hospital v. Commissioner of the Division of Medical Assistance, 437 Mass. 417, 426-27 (2002), that “(t]he doctrine of exhaustion of administrative remedies is one of deference to the Legislature where it has expressed its intent that a particular question be determined in the first instance by an administrative agency. Exceptions are rare.”
B.Applicability of the Exhaustion Doctrine in This Case
In Athol, the pertinent regulations “expressly required] [plaintiffs] to exhaust their administrative remedies before seeking judicial review. The regulations were promulgated pursuant to legislative authority.” Id., at 421. See also Pires v. Wausau Ins. Co., 65 Mass.App.Ct. 1120 (2006) (regulations, promulgated pursuant to legislative authority, specify detailed procedures for obtaining review of a denial of plaintiffs claims, citing Athol]; Centennial Healthcare Inv. Corp. v. Commissioner of Div. of Medical Assistance, 61 Mass.App.Ct. 320 (2004) (court in Athol rejected the providers’ common-law claim for breach of contract where the regulations governing the providers’ contract established a procedure for administrative review of denials of payment).
In the present case, as in Athol, the applicable statute and regulations establish a procedure for administrative review of disapproval of submitted rates. The statute, G.L.c. 176G, §17, provides that the Commissioner “may promulgate rules and regulations as are necessary to carry out the provisions of this chapter . . .” The amended regulation, 211 CMR 43.08 (effective February 10, 2010[8]), provides that if the Commissioner disapproves a filing, the HMO may request a hearing on the disapproval, and that following the hearing the Commissioner “shall issue a written decision ...” The amended regulation then provides: “The HMO may not implement the disapproved rates, or changes at any time unless the Commissioner reverses the disapproval after a hearing or unless a court vacates the Commissioner’s decision.” Id. Because “the Commissioner’s decision” can only fairly be interpreted to refer to the “written decision” which the Commissioner must issue following the hearing (and not to the Commissioner’s “disapproval,” which is the subject of the hearing and decision), the clear import of §43.08 is that the HMO may ask a Court to “vacate [ ] the Commissioner’s decision” only after the HMO has exhausted the administrative process that results in that decision. The procedure for appealing that decision to a court is prescribed by G.L.c. 30A.
Accordingly, there can be no dispute that, unless they can establish that the circumstances of this case present one of the “rare” exceptions to the doctrine of exhaustion of administrative remedies, Athol, supra, 437 Mass, at 426, the plaintiffs must first pursue those remedies.
C.The Futility Exception
Plaintiffs allege that pursuit of their administrative remedies would be futile.[9] Plaintiffs argue, in effect, that the Commissioner has made plain his “scheme” to cap rates at an arbitrarily low level, purposefully ignoring the actuarial standards which plaintiffs contend he is required to consider in his determination of adequacy of rates; in view of that scheme, plaintiffs contend, the administrative process established in 211 CMR 43.08 provides merely an opportunity for the Commissioner to rubber-stamp his earlier decision.[10]
Even assuming that plaintiffs contentions are true, the cases in which the futility exception has been applied do not support its application here.
For example, in Stock v. Massachusetts Hosp. Sch., 392 Mass. 205 (1984), the plaintiffs (a young man with special education needs, and his parents) sought relief from a decision by school authorities that he would graduate from high school at the upcoming June graduation, with the consequence that he would no longer be eligible for special education services. The plaintiffs received no notice of that decision until months after his graduation, and had no opportunity to challenge the decision through normal procedural avenues. Stock, at 207-08. In those circumstances, the court concluded that “invocation of the administrative procedures was virtually impossible, and thus, of course, futile.” Id. at 213.
Moreover, the court in Athol, contrasting the circumstances in that case with those in Stock, observed that “(h]ere, the hospitals were not denied an administrative appeal, they elected not to pursue one.” Athol, at 425. Similarly, in the present case, prior to filing suit all but one Plan had yet to file a request for hearing with the Commissioner.
Plaintiffs rely also on Ciszewski v. Industrial Acc. Bd., 367 Mass. 135, 141 (1975), a case which the Court in Athol also distinguished in circumstances similar to those here. Rejecting the hospital plaintiffs’ futility argument, the court stated that, in Ciszewski, “we said that the futility exception to the requirement for exhaustion applies ‘where the power and authority of the agency themselves are in question, and not where the exercise of the agency’s discretion is challenged.’ ” Athol supra at 425. By contrast, the court notes, the plaintiffs in Athol
do not challenge the power or authority of the division to determine whether the services provided were medically appropriate. Rather, they challenge *72 the standards used to make the determination as to [whether] there is no more conservative or less costly course of treatment. Thus, their challenge goes to the division’s exercise of discretion.
Athol, at 425-26.
In the present case, the plaintiffs argue not that the Commissioner lacked the power or authority to determine whether their submitted rates were adequate, but rather that he used incorrect standards in making those determinations — in other words, as in Athol plaintiffs challenge the basis upon which the Commissioner exercised his discretion.
Nor does the fact-intensive nature of the matters at issue in this case favor application of the futility exception; to the contrary, the appellate cases show a reluctance to adopt the exception where the agency’s fact-finding role is significant. For example, in Ciszewski, the court noted that the futility exception may be available “especially . . . when no fact-finding by the agency is required.” Ciszewski, supra, 367 Mass. at 141. In Athol, at 426-27, the court observed:
Although futility is ... an exception, it does not apply in the circumstances of this case. All factual issues on the question of the medical necessity of services could be resolved by the board of hearings. If the board of hearings applied the law incorrectly to the facts it found, such an error could be rectified in a complaint for judicial review under G.L.c. 30A, §14 . . .
See also St. Luke’s Hospital v. Labor Relations Commission, 320 Mass. 467, 470 (1946) (“To permit judicial interference with the orderly administration by the commission of matters entrusted to it by the Legislature before it has commenced to exercise its authority ... or before it has had an opportunity to determine the facts and make a final decision, would in effect transfer to the courts the determination of questions which the Legislature has left in the first instance to the commission, and would result in the substitution of the judgment of the court for that of the commission ”); cf. Construction Industries of Massachusetts v. Commissioner of Labor and Industries, 406 Mass. 162, 166-67 (1989) (where Commissioner concedes that administrative remedy would be futile, parties have entered into “an extensive stipulation of facts,” and the question is essentially one of statutory interpretation and challenge to the authority of the commissioner to set wage rates, declaratory relief is appropriate).
Finally, Lahey Clinic Foundation, Inc. v. Health Facilities Appeals Board, 376 Mass. 359 (1978), sounds a cautionary note where a court is asked to take on the fact-finding role that plaintiffs ask this Court to assume. In Lahey Clinic, plaintiffs (ten taxpayers) contended that the Department of Public Health’s extension of a determination of need (DoN) granted to Lahey Clinic Foundation for construction of the hospital-clinic in Burlington was in substance a grant of a new DoN, subject to review by the board. “A judge of the Superior Court, after seventeen days of trial, ruled against that contention. [On appeal,] [w]e hold that the issue should have been determined by the board.’’[11] Id. at 361. See also Athol, at 422: “Even if, as the hospitals contend, some regulations promulgated by the division constitute a breach of the provider contract ... , it does not follow that the remedy for such a breach is a juiy trial to determine whether it was appropriate to provide the service on the more costly inpatient basis and whether the services would be compensated on that basis.”
There is no question in this case that a determination of whether the Commissioner’s disapproval of the submitted rates was proper, and of what relief if any is warranted, will require extensive findings of factual issues that lie squarely within the special expertise of the Division of Insurance. One need only review the reasons for disapproval stated in the April 1, 2010 disapproval letters, and the Plans’ responses to those reasons, to understand the scope of the record that must be developed, and the factual issues that must be resolved, before the validity of those disapprovals can be determined.[12]
Accordingly, the Court concludes that plaintiffs have failed to demonstrate that exhaustion of their administrative remedies would be an exercise in futility.
D. Whether Plaintiffs’ Failure to Exhaust Administrative Remedies Deprives the Court of Jurisdiction Over Their Motion for Injunctive Relief
The appellate cases suggest that, in some circumstances at least, a court is not ousted of jurisdiction over equitable matters solely because a plaintiff has failed to exhaust administrative remedies in a case where no exception to that requirement has been established.
In support of that proposition, plaintiffs cite Stock, supra, 392 Mass. at 212-13, where the court stated that
the doctrine of primary jurisdiction [i.e., prior resort to court before any administrative action is begun, which is the functional equivalent of the doctrine of exhaustion of administrative remedies] is limited by several exceptions. Exhaustion is not required where it would prove futile, or where only questions of law are presented to the court, or where irreparable harm would result if judicial action were delayed by the implementation of the administrative process.
Interestingly, the court then cites cases in support of the futility and question of law exceptions, but none for the irreparable harm “exception.” The court’s inclusion of irreparable harm as an “exception” to the doctrine of exhaustion of administrative remedies must be viewed in the context of the facts of Stock, in that case, there was no longer any practical possibility *73 of administrative process to be exhausted — the only means by which irreparable harm could be averted was through court action. In the more typical case, such as this one, where administrative process remains available, application of the Stock irreparable harm “exception” would threaten to swallow the rule of exhaustion. Indeed, the court in Stock may have had that danger in mind when, after noting that the futility exception applied because it was “virtually impossible” for the plaintiffs to invoke the administrative proceedings, the court added:
We hasten to caution that these exceptions to the primary jurisdiction requirement in agency proceedings are to be confined to narrow circumstances, as in situations where parental reliance on school authorities is likely to be great, and parental knowledge of administrative procedure likely to be absent. Nothing herein is to be construed as permitting an evasion of the administrative process.
Stock at 213, n. 14.
Finally, while Stock refers to irreparable harm as an “exception” to the exhaustion doctrine, that reference is a passing one at best, where the court concluded that the exceptions which actually applied in that case were questions of law and futility. Stock at 213. Because plaintiffs here have established neither of those exceptions, the argument that Stock confers jurisdiction over their motion for injunctive relief is weak.
Other cases provide a similar level of support for plaintiffs assertion of jurisdiction. In East Chop Tennis Club v. Mass. Comm. Against Discrimination, supra, 364 Mass. at 448-50, the court discusses a rule of equitable intervention, despite failure to exhaust administrative remedies, established in Meenes v. Goldberg, 331 Mass. 668 (1954). In Meenes, the plaintiffs (former owners of property subject to a tax lien) sued defendants (successor owners) for a declaration regarding who was responsible for the lien in question, and not challenging the validity of the assessment itself. The City of Worcester appealed the court’s decree that the lien had been discharged, arguing that statutory remedies of abatement and payment of tax under protest were both adequate and exclusive. The court in Meenes affirmed the Superior Court decree, holding that the statutory language concerning exclusive remedies “did not prevent [the court] from granting equitable relief in certain circumstances, which it felt were present in that case.” East Chop, at 449.
The court in East Chop distinguishes the rule of Meenes as having been
followed in a long series of cases for declaratory relief also involving tax challenges . . . However, we have generally not extended its application to reach other types of cases involving different administrative agencies and procedures, although there are exceptions [citing cases involving inter-agency disputes]. Furthermore, even within the context of the tax cases themselves we have often emphasized that the ordinary requirement of exhaustion will be suspended only when the facts of a particular case raise important public questions whose resolution concerns or will affect more persons than the parties to the case.
East Chop, at 449.
Finally, as noted above in Lahey Clinic, supra, 376 Mass. at 370, the court stated: “If an administrative agency is acting in violation of law, and irreparable injury is threatened, equitable relief may well be available . . . But the Court should not exercise its jurisdiction so as to usurp the powers of the board.” In Lahey Clinic, it will be remembered, the Supreme Judicial Court concluded that the trial judge should have required plaintiffs to exhaust their administrative remedies.
The present motion certainly raises “important public questions whose resolution concerns or will affect more persons than the parties to the case,” East Chop, at 449. For purposes of this case, therefore, and in light of the decisions just noted, the Court will assume that it has jurisdiction over that motion.
II. Injunctive Relief
A plaintiff seeking a preliminary injunction must demonstrate “(1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the plaintiffs likelihood of success on the merits, the risk of irreparable harm to the plaintiff outweighs the potential harm to the defendant in granting the injunction.” Tri-Nel Management, Inc. v. Board of Health of Barnstable, 433 Mass. 217, 219 (2001) (citation omitted). “When, as here, a party seeks to enjoin governmental action, the court also considers whether the relief sought will adversely affect the public.” Id. (and cases cited).
A. Likelihood of Success on the Merits
The plaintiffs challenge two “illegal and unconstitutional actions by” the Commissioner: “1) the Commissioner impermissibly disapproved submitted rate increases for April 2010, based on a predetermined, arbitrary and inadequate rate cap; and 2) the Commissioner impermissibly directed that plans whose rates were disapproved must use April 2009 rates, which are even more inadequate than the rates created by the arbitrary cap.” Plaintiffs’ Memorandum, at 1-2.
The “direction] that plans . . . must use April 2009 rates” refers to the Guidance, which plaintiffs allege “is improperly adopted, has no legal effect, and imposes rates that are presumptively inadequate . . .” Plaintiffs’ Memorandum, at 11. Specifically, plaintiffs allege that the Guidance “dictates that, in the event the Commissioner disapproves a Submitted Rate, the Plan must charge the Year-old Rates — or more specifically, rates effective as of April of2009.” At the hearing on plaintiffs’ motion for injunction, the Commissioner *74 conceded that the Guidance has no independent legal standing, is not a regulation, and was intended as no more than advice.[13] While defendants may dispute the accuracy or applicability of that advice, the Commissioner’s concession resolves any dispute as to whether the Guidance itself constitutes an action of the Commissioner as to which plaintiffs require relief.
Plaintiffs contend that they nevertheless have shown a likelihood of success on the merits because they have demonstrated that, by disapproving those submitted rates which were higher than 150% of the Medical CPI, the Commissioner “impermissibly disapproved submitted rate increases for April 2010, based on a predetermined, arbitrary and inadequate rate cap.” Plaintiffs’ Memorandum, at 2. Plaintiffs argue that the Medical CPI is the wrong yardstick by which to measure the reasonableness and adequacy of the Plans submitted rates, and offer affidavits of Plan actuaries, and of plaintiffs’ actuarial expert, Richard G. Murdock, in support.
The Commissioner’s response is not so much to defend the applicability of the Medical CPI (an issue he argues can be sorted out by the administrative hearing officer on the factual record from that proceeding), as to point out that the disapproval letters recite reasons for disapproval that are wholly independent of the Medical CPI “cap.” He notes that the disapproval letters themselves state that “the Division may have independently disapproved the [Plan’s] filing for each reason listed,” Beagan Aff., Ex. 2, and that Deputy Commissioner Beagan, who signed the letters, confirms as much in his affidavit. Id., para. 14.
While plaintiffs offer some response to the other, independent reasons stated in the disapproval letters, [14] plaintiffs’ evidence as to those reasons is scant and unpersuasive. Accordingly, the Court concludes that plaintiffs have failed to demonstrate a likelihood of success on the merits of their challenge to the disapprovals of their submitted rates for April 2010.
B. Irreparable Harm
Plaintiffs allege that, absent the injunction they seek, they will suffer irreparable harm in the form of potentially crippling financial losses, market uncertainly, and administrative burden and expense. Specifically, plaintiffs claim that,
[a]bsent relief from this Court, the individual Plaintiffs will suffer collective losses that threaten to amount to well over $100,000,000.00, losses that will deplete their near-term reserves, weaken their financial stability, and in some instances threaten their near-term solvency. Moreover, without preliminary relief, the market will suffer substantial uncertainty and turmoil as the individual Plaintiffs and consumers endeavor to make significant long-term business decisions on what are likely temporary conditions.
Complaint, para. 2. In addition, plaintiffs contend that Plans will also suffer “undue administrative and operational burdens because of unexpected subscriber confusion and uncertainty regarding applicable rates, which may lead subscribers to terminate existing contracts and attempt to change Plans.” Plaintiffs Memorandum, at 10. Moreover, “most of the plans have no systems in place to revise rates on a retrospective basis; implementing the credit or reimbursement required by the Commissioner’s action will involve substantial administrative cost and effort.” Id.
Ordinarily, financial losses, standing alone, will not satisfy the irreparable harm requirement: if money can be recouped, the harm is not irreparable. At some point, however, financial harm can become so significant, and the likelihood of recovery so remote, as to amount to irreparable harm. The Commissioner, citing Tri-Nel Management, Inc. v. Board of Health of Barnstable, supra, 433 Mass. at 227-28 (quoting Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 399 Mass. 640, 643 (1987)), argues that plaintiffs alleging economic harm must show that “the very existence” of their business is at stake if relief is denied. Plaintiffs, quoting Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18, argue that, “[t]o establish irreparable harm, ... a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business.” Rather, plaintiffs contend, they need show only that absent relief they will suffer a loss of rights that “cannot be vindicated should [they] prevail after a full hearing on the merits.” Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980).
Even applying the lower standard urged by plaintiffs, the Court concludes that they have not demonstrated that they will suffer irreparable economic harm over the next few months, Le., that period of time during which they may pursue their administrative remedies and any appeal therefrom. The Court reaches that conclusion because (1) the plaintiffs’ supporting affidavits do not present compelling evidence that the Plans’ business will be irreparably crippled over the next few months if injunctive relief is denied;[15] (2) to the contrary, the Commissioner has demonstrated that one measure, calculated by the Plans themselves, indicates that the reserves and solvency of the Plans are stable, and should continue to be so in the near term;[16] (3) plaintiffs have not persuaded the Court that they will fail to recoup a substantial portion of any premium increases to which they may be ultimately entitled; and (4) plaintiffs have not demonstrated that the administrative costs and burden they face are so great as to constitute irreparable harm.
C. Balance of Harms and the Public Interest
The last two elements which plaintiffs must satisfy are, first, that the harm they will suffer if no relief is granted outweighs the harm to the Commissioner if *75 relief is granted; and, second, that in any event the relief sought would not adversely affect the public. In the context of this case, it is appropriate to consider those elements together, insofar as the Commissioner is responsible to the public for ensuring that subscriber contracts provide reasonable benefits, and that the rates which subscribers pay are not excessive, inadequate or unfairly discriminatory. G.L.c. 176G, §16.
Plaintiffs argue that,
[a]s a result of the Commissioner’s actions, the public interest will suffer harm as well. Subscribers will experience confusion and uncertainly about applicable rates . . . ; individual HMO members may experience a disruption in access to certain health management services if subscriber suddenly switch Plans . . . ; small businesses will be forced to bear a sudden and sharp rate increase if the Commissioner’s actions are reversed and the Plans are allowed to recoup the accumulated difference between the Submitted Rates and the interim rate . . . ; and the public generally will suffer a disruption in access to health care if Plans’ financial instability renders them unable to pay future claims . . .
Plaintiffs’ Memorandum, at 10.
In the Court’s view, the confusion, uncertainty, and disruption predicted by plaintiffs would be exacerbated, not relieved, were the Court to grant the injunction they seek. After the Commissioner disapproved the Plans’ proposed rate increases on April 1, 2010, all parties knew or should have expected that the rates for renewing small group and individual subscribers would remain unchanged from the April 2009 base rate, as adjusted in accordance with rating factors which were known and which had not been disapproved by the Commissioner as of March 31, 2010. If the Court were now to enjoin the Commissioner from preventing the Plans from charging and collecting their proposed higher rates, the Court would in effect be stepping into the Commissioner’s shoes and approving those rates — but only for the life of the preliminary injunction, which would cease once the case was tried and a final order entered. If that final order were to reinstate the Commissioner’s disapprovals, then small group and individual subscribers will have been subjected to unnecessary reversals of expectations.
In short, plaintiffs have not persuaded the Court that their case for a preliminary injunction, entered at the very outset of this dispute, is so strong as to outweigh the risk of further market disruption if plaintiffs do not ultimately prevail. As the Court has ruled above, whether the Commissioner’s disapproval was validly exercised should be determined on a factual record to be developed before an administrative hearing officer. Were the Court now to grant the injunction which plaintiffs request, the Court would in effect be weighing in on issues that should in the first instance be decided by that hearing officer. The orderly process which Massachusetts law provides for administrative review, followed if necessaiy by Court review, will in the Court’s view best serve the interests of the parties and of the public.
ORDER
For the reasons stated above, plaintiffs’ motion for preliminary injunction is DENIED. As a result of that denial, the plaintiffs’ motion for expedited discovery and expedited trial on the merits is also DENIED.

 Blue Cross and Blue Shield of Massachusetts, Inc. (BCBSMA) is a nonprofit hospital and medical service corporation that offers health insurance to the merged market pursuant to G.L.c. 176A, §10 and G.L.c. 176B, §4. For the purposes of this motion, however, the term “HMO” shall apply to BCBSMA as well.

 Throughout the year, the Plans negotiate annual contracts with the various small businesses and individuals for whom they provide coverage. Thus, yearly coverage for any member of the merged market could begin in any given month and must be renewed one year hence. At issue in this motion are those subscriber contracts that were to be renewed on or after April 1, 2010, which the Plans estimate account for 50,000 groups and 200,000 members overall, or roughly 25% of the total coverage provided to the merged market.

 The Commissioner on that date issued corresponding Bulletin 2010-05, which set forth the same requirements as to BCBSMA.

 Plaintiffs contend that the consumer price index for medical care services, or Medical CPI, is a retrospective assessment of the change in the market basket of goods and services defined by the Bureau of Labor Statistics, and thus not a reliable predictor of future trends. Murdock Aff., para. 20.

 The Depuiy Commissioner identified other reasons for the recommendation of disapproval, e.g., that the submissions had failed to indicate that the Plans had negotiated decreases in reimbursement rates with network providers; that the differences in reimbursement rates among the individual Plans’ network providers were not based on differences in qualiiy of care delivered, patient mix, geographic location at which care is provided, or intensity of services provided; and that the differences in reimbursement rates among the Plans’ network providers were based on market power rather than on criteria permissible under the amended regulation. See, e.g., id.

 For present puiposes, the Court will assume that an “actual controversy” exists between the parties, satisfying the requirement of the declaratory judgment statute, G.Lc. 231A, §1, under which plaintiffs bring their complaint.

 Plaintiffs do not dispute the facial validity of amended 211 CMR 43.08.

 In that regard, plaintiffs address the requirements of c. 231 A, §3, regarding “failure to exhaust administrative relief,” by means of, e.g., the affidavit of Sarah Gordon, Esq., Vice President of MAHP, para. 10: “MAHP has alleged in this action that the Commissioner’s reliance on the Medical CPI as the basis for the Disapprovals is a practice or procedure that is arbitrary and capricious and in excess of the Commissioner’s authority . . . This practice or procedure is known to exist by *76 the Commissioner and ... is the Commissioner’s customary and usual method of conducting agency business. As a result, reliance on administrative relief as a remedy for this practice or procedure would be futile.” The Court will assess the futility claim in view of the cases reviewed herein.

 While the Commissioner denies any such scheme or other wrongful action, he has undertaken to blunt plaintiffs’ criticism of the administrative process by delegating his “authority as the final decision maker in the above-referenced proceeding [Harvard Pilgrim Health Care’s request for hearing on the Division’s disapproval of merged market rate filing] to Susan Donegan, Counsel to the Commissioner.” Opposition to Plaintiffs’ Motion for Injunctive Relief, Ex. A. Cf. East Chop Tennis Club v. Mass. Comm. Against Discrimination, 364 Mass. 444, 452 (1973) (where the investigating commissioner had determined that the club was not a private facility, that does not mean further proceedings would “obviously be meaningless” because statute provides that investigating commissioner shall not participate in the commission’s deliberations on the case: thus, the “hearing before the commission is clearly separate from any proceedings conducted by the investigating commissioner and the commission is to make its own independent determination of facts based on the evidence before it”). Here, the Commissioner’s trial counsel indicated, during the April 8 hearing on the present motion, that the Commissioner intends to make the same delegation as to any hearing which other plaintiffs may request under 211 CMR 43.08. Counsel also stipulated on behalf of the Commissioner that plaintiffs may request such a hearing without waiving any rights or positions which plaintiffs have asserted in this case. Counsel has since notified the Court that Tufts Associated HMO, Inc., BCBSMA, and BCBSMA HMO Blue have submitted hearing requests.

 In the circumstances of that case, the Supreme Judicial Court concluded that, in view of the public interest in a speedy resolution of the controversy, it would review the merits of the judge’s decision, id., but went on to note: ‘To avoid misunderstanding, we add that we are not holding that the Superior Court was without jurisdiction in the premises. The DoN statute ... requires the board to issue a final decision within sixty days after filing of the appeal, and the judge acted after the period had expired. If an administrative agency is acting in violation of law, and irreparable injuiy is threatened, equitable relief may well be available... But the Court should not exercise its jurisdiction so as to usurp the powers of the board.” Id. at 370.

 See, for example, the disapproval letter to plaintiff Blue Cross and Blue Shield of Massachusetts, Inc. (attached to Vertes Aff.), which cites the following reasons, among others, for disapproval: “BCBSMA’s Filing fails to illustrate how BCBSMA is paying providers differing rates of reimbursement solely based on (a) quality of care, (b) mix of patients, (c) geographical location at which care is provided, or (d) intensity of services provided, as identified in 211 CMR 43.08(1)” (paragraph (1) (a)); “BCBSMA’s Filing contains rates that are unreasonable and excessive because BCBSMA’s rates were developed with a contribution-to-surplus load, and the rates include a contribution-to-surplus load, that is not within 0% to 1.9%, which the Division finds to be a reasonable range for the contribution-to-surplus load” (paragraph (2)); “BCBSMA’s Filing contains rates that are unreasonable and excessive because BCBSMA’s Filing uses an inadequately supported rate stabilization adjustment for its Preferred Providers Organization (PPO) products” (paragraph (3)). Those examples from one disapproval letter, replicated, with some variations, for each of the other six Plans, give some sense of the scope of factual disputes to be resolved.

 To the extent that the disapproval letters purport to require the Plans to follow the Guidance, the Commissioner has also conceded, through counsel, that while the April 2009 base rates remain in effect for the affected groups, “this does not mean that the premiums that may now be charged necessarily remain the same as those in effect in April 2009. They are subject to changes, presumably increases, resulting from the application of various rating factors to the April 2009 base rate that carriers have filed, and which have not been disapproved.” (Emphasis in original.) Post-hearing submission to the Court from Assistant Attorney General David Guberman dated April 9, 2010, at 1. Plaintiffs respond (see April 9 submission by attorney Dean Richlin) that the rating factor adjustments will not necessarily result in increases to the April 2009 base rate, and suggest that it may be “more logical” that upon disapproval, the applicable rate should be the last approved rate for the product in question" (emphasis in original); nevertheless, there appears to be no real dispute that, in the wake of the Commissioner’s disapprovals of the April 2010 submitted rates, the rates which the Plans may charge small group and individual subscribers are the April 2009 base rates as adjusted by rating factor adjustments which the Plans have submitted and which the Commissioner has not disapproved. See Beagan Aff., paras. 25-26, and Ex. 3.

 See, e.g., Trocki Aff., para. 40-41: ‘The second reason given by the Division for disapproving FCHP’s Submitted Rates is that ‘Fallon’s Filing contains rates that are unreasonable and excessive because Fallon’s rates were developed with a contribution-to-surplus load [i.e., margin], and the rates include a contribution-to-surplus load, that is not within 0% to 1.9% which the Division finds to be a reasonable range . . .’ I am unaware of any DOI guidance, or other actuarial guidance, that indicates that a ‘contribution-to-surplus load’ over 1.9%, or of 2.5% [i.e., the margin contained in Fallon’s April 2010 submission], is unreasonable or excessive. In my opinion, a ‘contribution-to-surplus load’ of 2.5% in the Submitted Rates is reasonable, and not excessive, particularly given the heightened and inherent risks in the merged market.”

 The Plans’ respective affidavits set out projected deficits under various scenarios; what they do not do is establish, for the period extending over the next few months (1) the deficit resulting from charging and collecting the rates which the Plans may now charge small group and individual subscribers beginning April 1, 2010 (i.e., the April 2009 base rates with allowable adjustments through March 31, 2010) rather than the Plans’ submitted rates for April 1, 2010; (2) that the near-term deficit in collections from small group and individual subscribers is likely to be material to the Plans’ overall financial results for the year; and (3) if material, that the deficit poses a serious threat to the Plans’ financial stability.

 See Beagan Aff., at paragraphs 6-9, wherein the Deputy Commissioner describes “Risk Based Capital (RBC),” “[o]ne of the primary tools by which the Division’s Financial Analysis staff monitors insurers’ solvency.” An insurer’s RBC is determined by comparing its Total Adjusted Capital to its Authorized Control Level Risk-Based Capital. In March 2010, at the request of the Deputy Commissioner, insurers who submitted rate filings, including each of the Plans which are plaintiffs in this case, submitted data regarding their “projected RBC ratios under different base rate scenarios.” The Deputy Commissioner states that, “under a ‘worst case scenario,’ in which no rate increase would be approved, the plaintiffs’ RBC projections for 2010 fall between the range of 128% and 393% . . . These projections were developed solely by the insurers and have not been audited or verified by the Division. These projections are inconsistent with the insurers’ assertions made in this lawsuit that the Commissioner’s disapproval of rate increases threatens certain insurers’ ‘near-term solvency,’ which, if accurate, would mean an RBC of 70% or below.”