Neel, Stephen E., J.
On April 5, 2010, plaintiffs Massachusetts Association of Health Plans (MAHP) and associated individual health plans (Plans) filed this action, and moved for an order enjoining defendant Joseph G. Murphy, Commissioner of Insurance (Commissioner), from prohibiting or preventing the Plans from charging and collecting increased rates from small group and individual subscribers effective April 1, 2010. On April 12, 2010, after hearing, the Court denied the motion.[2] The Commissioner now seeks an injunction ordering two of the Plans, Harvard Pilgrim Health Care, Inc. (Harvard Pilgrim) and Fallon Community Health Plan (Fallon),
to comply with the disapproval letters he issued on April 1, 2010, including, but not limited to, his direction that, as a result of his disapproval of new rates proposed for April 2010, they must use the April 2009 base rates, subject to applicable, approved rate factor adjustments, for coverages issued or renewed to groups in April 2010.
Commissioner’s Emergency Motion for Injunctive Relief, at 1. Plaintiffs as a group, and Harvard Pilgrim and Fallon individually, oppose the motion.[3] After hearing, and review of the memoranda, affidavits, and other materials submitted, the Court concludes that the Commissioner’s interpretation of the relevant statute and regulations is reasonable and deserving of deference by the Court, and that, during the pendency of administrative hearings and appeals in this matter, relief which the Commissioner seeks is necessary to prevent further disruption of the small group and individual market and of the regulatory scheme through which that market is managed.
BACKGROUND
Following the Court’s April 12 Order, the Commissioner issued a letter to the Plans informing them that they were failing to make their health benefit plans available in the small group market and were refusing to provide prospective insureds with pricing information as required by law (April 13th Directive). The April 13th Directive further states that the Plans are obligated under G.L.c. 176J and 211 CMR 66.00 to offer and issue policies and to provide prospective insureds with rate quotes upon request at all times. See, e.g., Affidavit of Commissioner, Ex. 2, 3. The April 13th Directive extended to April 15 the time within which each Plan was to certify that it had submitted recalculated rate quotes to all of its distribution channels.
By April 15, 2010, each of the Plans had filed with the Division of Insurance (Division) letters and accompanying certificates of compliance and evidence of coverages as requested in the April 13th Directive. The Commissioner states:
All of the Carriers, except Harvard Pilgrim and Fallon, complied with the directive and demonstrated that they were implementing, or making a good faith effort to implement, the base rates from April 2009 for the April 2010 affected Small Group members and individuals and had assured the Division that such rates were being quoted through their distribution channels.
Commissioner’s Aff., para. 17. Harvard Pilgrim and Fallon, on the other hand, filed letters indicating that they would charge the rates which they respectively filed with the Division for March 2010, which they referred to as the most recent rates which were not disapproved.
On April 16, 2010, the Commissioner issued letters to Harvard Pilgrim and Fallon informing them that he found their use of their “last approved rates,” rather than the April 2009 rates, to be non-compliant with the Division’s instructions. On April 16 his counsel served and filed the present motion for injunctive relief.[4]
DISCUSSION
When a private party seeks a preliminary injunction, it must first show that an irreparable injury, not capable of remediation, would occur without immediate injunctive relief. Packaging Indus. Group, Inc v. *78 Cheney, 380 Mass. 609, 617 (1980). Aprlvate plaintiff must also show that there is a likelihood of success on the merits of the case at trial. Id. An injunction may properly issue only if the Court “concludes that the risk of irreparable harm to the plaintiff, in light of his chances of success on his claim, outweigh the defendant’s probable harm and likelihood of prevailing on the merits of the case.” Commonwealth v. Mass. CRINC, 392 Mass. 79, 87-88 (1984).
When, however, “a suit is brought ... by the government ... to enforce a statute or a declared policy of the Legislature irreparable harm is not required.” LeClair v. Town of Norwell, 430 Mass. 328, 331 (1999). Because the representative of a government agency is “acting in accordance with his broad common law and statutory powers to represent the public interest . . . ‘[t]he standard of requiring a demonstration of immediate irreparable harm, employed in civil litigation as a condition precedent to the granting of injunctive relief, is not a prerequisite to the allowance of an injunction to the plaintiff in this case.’ ” Mass CRINC, 392 Mass. at 88-89. Rather, in a case like the present one, the Court must determine first whether there is a likelihood of success on the merits of the claims, and then determine whether “the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Id. at 89.
Pertinent to the Court’s determination of the Commissioner’s likelihood of success on the merits is the degree of deference due his interpretation of his authority. “A state administrative agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing.” A. Celia, Administrative Law and Practice, §747 (1986). An agency’s interpretation of a statute and properly adopted regulations must not be rejected unless it cannot be reconciled with the governing legislation. Nuclear Metals, Inc. v. Low Level Radioactive Waste Mgmt. Bd., 421 Mass. 196, 211 (1995). Thus if the Commissioner’s interpretation is, by any reasonable construction, in harmony with the legislative mandate, the Court must accord it considerable deference. Id.
A. Likelihood of Success on the Merits
The legal question raised by the Commissioner’s motion and the plaintiffs’ opposition is this: in light of the Commissioner’s disapprovals of the Plans’ submitted rates for small group and individual contract renewals and new contracts effective April 1, 2010, what rates apply to those contracts during the administrative appeals process now underway? The Commissioner argues that the applicable rates are the April 2009 base rates, as adjusted according to non-disapproved rating factors. The Plans argue that the applicable rates are the “last approved rates," i.e., those rates submitted and not disapproved for March 2010.
To the extent that the parties addressed the issue in their submissions and at the hearing on plaintiffs’ motion for injunctive relief, the Court concluded, in its April 12 Order, at 18, n. 13, as follows:
there appears to be no real dispute that, in the wake of the Commissioner’s disapprovals of the April 2010 submitted rates, the rates which the Plans may charge small group and individual subscribers are the April 2009 base rates as adjusted by rating factor adjustments which the Plans have submitted and which the Commissioner has not disapproved. See Beagan Aff., paras. 25-26, and Ex. 3.
Interestingly, while disclaiming any waiver of their position that the April 2009 rates as adjusted do not apply, five of the seven Plans have nevertheless “complied with the directive and demonstrated that they were implementing, or making a good faith effort to implement, the base rates from April 2009 for the April 2010 affected Small Group members and individuals and ha[ve] assured the Division that such rates were being quoted through their distribution channels.” Commissioner’s Aff., para. 17. Those five Plans’ compliance with the Commissioner’s directive, while not conceded to be a waiver, is nevertheless suggestive of their assessment of the Commissioner’s likelihood of succeeding on his claim that, during the administrative appeals process, the April 2009 rates are in effect. Only Harvard Pilgrim and Fallon have challenged the Commissioner’s directive by failing to comply with it.
Harvard Pilgrim argues that the March 2010 rates should apply because they are “the premium rates that are currently in effect and have been used for customers who joined or renewed health plans in the merged market after March 1, 2010 . . . [and] have never been disapproved or otherwise challenged by the Commissioner ...” Harvard Pilgrim’s Opposition, at 5. Fallon argues that
the rates that are filed with the Division are base rates for specific insurance products[5] made available to the merged market, not the rates that will be used for specific groups or individuals . . . Groups or individuals who are seeking to renew their policies may choose to renew using the same products as they previously had ... or different products, depending on their needs. New groups or individuals, by definition, would be purchasing new products, since they do not have a current FCHP insurance policy ... It makes no sense to require FCHP to sell that new customer a product at April 2009 rates and it makes perfect sense to permit FCHP to sell that product to the new customer at the last approved based [sic] rate for that product— the March 2010baserate. Similarly, ifFCHP should be permitted to sell a new customer a product at the last approved, March 2010 base rate, it follows that FCHP should be able to renew an existing customer at the last approved base rate for whatever product that existing customer decides to purchase.
Fallon’s Opposition, at 7-8 (emphasis in original).
*79 The Commissioner responds that the Plans’ rate submissions apply not just to “products” but to groups and the products offered those groups[6] through yearly contracts, which are typically effective beginning in a given month: once annual contracts come to an end, the Plans must submit new rates at which they seek to have the contracts renewed. According to the Commissioner, the same applies to new subscriber contracts, which are issued at the same rates as for renewals for that month.
Both sides agree that neither the statute nor the regulations address the precise issue here. Nevertheless, the question which the Court must decide is not whose interpretation is better or more sensible, or even whose interpretation is better represented in submission-related documents; the question is whether the Commissioner’s interpretation, in the context of an admittedly novel issue, for the period during which the Plans pursue their administrative remedies, “is, by any reasonable construction, in harmony with the legislative mandate,” Nuclear Metals, Inc., supra, 421 Mass. at 211. On the record before it, the Court answers that question in the affirmative.
The statute, G.L.c. 176G, sec. 16, does not speak in terms of “products.” Rather, it states in pertinent part as follows:
The subscriber contracts, rates and evidence of coverage shall be subject to the disapproval of the commissioner. No such contracts shall be approved if the benefits provided therein are unreasonable in relation to the rate charged, nor if the rates are excessive, inadequate or unfairly discriminatory.
The regulation — 211 CMR 43.08, as in effect when both the April 2009 and the March 2010 rates were submitted and approved — provides that “(e]ach HMO shall submit proposed rates and benefits, or changes thereof, on or before their effective dates and at least at the beginning of each calendar quarter. Submissions are subject to the Commissioner's disapproval if the benefits and rates do not meet the requirements of M.G.L.c. 176G, §16.” It is consistent with the language of the statute to conclude, as the Commissioner does, that “subscriber contracts” refers to small group and individual policies, not simply the particular plans (products) chosen under those contracts. Even were that not the case [Le., assuming that Harvard Pilgrim and Fallon are correct that only “products” are the subject of submitted rates), it is consistent with the language of the regulation to conclude, as the Commissioner does, that submission of “proposed rates and benefits, or changes thereof, on or before their effective dates,” contemplates renewals not from month to month, but from one annual “effective date” to the next.
That Harvard Pilgrim’s and Fallon’s interpretations may be preferable to or more sensible than the Commissioner’s is not enough: “[arguments that a different choice by the commissioner would have been preferable or more efficient will not undermine a choice that was authorized by the statute.” Arbella Mut. Ins. Co. v. Commissioner of Ins., 456 Mass. 66, 72 (2010). The Court concludes that the Commissioner’s interpretation of the controlling statute and regulation is reasonable, and therefore that he has established a sufficient likelihood of success on the merits.
B. The Public Interest
The Court must next determine whether “the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public.” Mass CRINC, supra, 392 Mass. at 89.[7]
The Commissioner argues that Harvard Pilgrim’s and Fallon’s non-compliance with his directive “sows confusion in the market-place. It creates an unequal playing field, to the detriment of the plaintiff carriers that are complying with their legal obligations. Absent judicial relief, the Commissioner is unable to fulfill his statutory responsibility to safeguard the insurance market-place.” Commissioner’s Memorandum, at 4. Specifically, in his affidavit, the Commissioner states:
14 . . . Permitting the Carriers to charge any rate that they believe reasonable, usurps the Division’s regulatory authority and leads to an unlevel playing field in the marketplace. For example, the Division did not disapprove three [non-plaintifi] Carriers’ base rates for the Small Group for effective dates of April 1, 2010 . . . The March 2010 base rates for Small Groups that Harvard Pilgrim and Fallon believe to be reasonable and within their rights to implement invoke higher rates, many in double digits, than the increases not disapproved for these compliant Carriers.
20.1 received telephone calls ... on April 15th, and over the course of the next few days, from executives of two of the other Carriers, BlueCross Blue Shield (“BCBS”) and Tufts Associate [sic] Health Maintenance Organization, that followed my April 13th Directive. Both executives informed me of their expectation that the unequal application of base rates in the small group merged market will promote consumer confusion, market disruption and adversely impact their financial condition if not remedied in short order. Specifically, they stated that they anticipate that major blocks of business will migrate from Harvard Pilgrim and Fallon to their books because the majority of their base rates (the April 2009 base rates) are now lower than the March 2010 base rates of Harvard Pilgrim and Fallon. (This is particularly troubling to these Carriers because they have no discretion to reject any of this business under the guaranteed issue provisions of M.G.L.c. 176J and their base rates, not disapproved and disapproved alike, will not have anticipated this shift in market share. This addi *80 tionally puts them at a competitive disadvantage in accepting new business that they are not prepared to accept.)
21. Harvard Pilgrim’s and Fallon’s disregard of the Division’s repeated directives to use April 2009 base rates for affected group members and new business is causing consumer confusion and threatens imminent market disruption. Both Harvard Pilgrim and Fallon have instructed their distribution channels to charge the significantly higher March 2010 base rates not even reviewed by the Division for the respective member group according to their April 15th Letters . . . This will continue to confuse small businesses and individuals as to what rates are accurate in the marketplace, raising questions as to what they should do in an ever-changing situation.
Harvard Pilgrim responds that the Commissioner seeks to alter, rather than preserve the status quo; that Harvard Pilgrim will suffer severe financial consequences if forced to charge the adjusted April 2009 rates; that forcing Harvard Pilgrim to comply with what it views as the Commissioner’s arbitrary, capricious, and ultra vires order is contrary to the public interest; and that any uncertainty created by the Commissioner’s .disapproval of Harvard Pilgrim’s proposed April 2010 rates will persist until the dispute is resolved, regardless of whether Harvard Pilgrim charges the March 2010 or the April 2009 rates. Fallon argues similar grounds, and in addition contends that if the Commissioner prevails, all previous base rate approvals for the past twelve months would be effectively nullified because subscribers will switch to plans with the April 2009 rates; and that Fallon’s relatively low cost base rates for April 2009 works a particular disadvantage to it.
The Court is not persuaded by Harvard Pilgrim’s and Fallon’s arguments. With regard to the argument that the Commissioner seeks to alter the status quo, the Court notes (1) that, as of April 12, there appeared to the Court to be “no real dispute that, in the wake of the Commissioner’s disapprovals of the April 2010 submitted rates, the rates which the Plans may charge small group and individual subscribers are the April 2009 base rates as adjusted,” April 12 Order, at 18, n.13, and (2) that the status quo immediately thereafter was that five of the seven plans were charging the adjusted April 2009 rates. Moreover, the likelihood that current subscribers will decide to switch to plans with April 2009 rates is affected by the potential risk which such a subscriber would likely consider in making that decision: although the April 2009 rates are being applied during the administrative hearing process, and any administrative appeal therefrom, it is possible that those proceedings and subsequent events may result in a rate applicable to April 2010 contracts that is different from, and higher than, the April 2009 adjusted base rates.[8] Nor do Harvard Pilgrim’s and Fallon’s additional arguments persuade the Court that the relief which the Commissioner seeks is contrary to the public interest.
ORDER
For the reasons stated above, the motion for preliminary injunction is ALLOWED as follows. It is hereby ORDERED that, until further order of the Court, Harvard Pilgrim Health Care, Inc. and Fallon Community Health Plan, Inc. are each RESTRAINED AND ENJOINED from implementing, for small group and individual subscribers effective April 1, 2010, the rates which they respectively filed with the Division for March 2010.
Fallon Community Health Plan’s Emergency Motion for Clarification is ALLOWED as follows: the Commissioner having demonstrated that his interpretation of the relevant statute and regulation is reasonable and deserving of deference, his direction that the Plans implement, for April 2010 small group and individual contracts, the April 2009 base rates as adjusted by approved rating factor adjustments, is valid and enforceable during the pendency of administrative hearings and appeals of his disapprovals of the Plans’ submitted rates for April 2010.

 See Memorandum and Order on Plaintiffs’ Emergency Motion for Injunctive Relief dated April 12, 2010 (April 12 Order), which sets out the chronology of the parties’ dispute, and is incorporated herein by reference [27 Mass. L. Rptr. 68].

 Fallon moves for clarification of the April 12 Order with regard to the applicability of the April 2009 base rates to the rates which the Plans may charge for April 2010 renewals and new subscribers.

 The Commissioner’s motion preceded his filing of an answer and counterclaim for such relief, which has now been accomplished.

 "A product will be a health insurance policy with a specific provider network, deductible and/or copay . . . , and FCHP offers a menu of products so that consumers have multiple choices that address their specific needs.” Fallon’s Opposition, at 7.

 See Commissioner’s Aff., para. 6.

 To the extent that the balance of harms is pertinent to the Court’s analysis, the record on the present motion does not lead the Court to a different conclusion than the Court reached in the April 12 Order.

 The same analysis holds for succeeding monthly renewals (i.e., May 2010), in the absence of approved rate submissions for such months.